IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **BRITTNEY JOHNSON,** | § | |
| *Plaintiff,* | § | |
| v. | § | |
| **CHILDCAREGROUP** | § | **CIVIL ACTION NO.:** _____ |
| *Defendant.* | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES, Plaintiff, Brittney Johnson ("Johnson" or "Plaintiff"), by counsel, complaining of Defendant, ChildCareGroup ("CCG" or "Defendant") and in support thereof respectfully shows the Court as follows:

### I.

#### INTRODUCTION

1.01   Defendant ChildCareGroup wrongfully fired Plaintiff from her job in violation of the Family and Medical Leave Act of 1993, 29 U.S.C. §2601, *et seq*. (the "FMLA").

### II.

#### THE PARTIES

2.01   Plaintiff Johnson is an individual who is a citizen of the State of Texas. Plaintiff can be contacted in care of her undersigned counsel.

2.02    Defendant ChildCareGroup is a domestic nonprofit corporation with headquarters in Dallas and has childcare centers throughout Texas. Plaintiff worked at the 1420 W. Mockingbird Lane, Suite 300, Dallas, Texas. Defendant's agent for service of process in the State of Texas is Victoria T. Mannes, 1420 W. Mockingbird Lane, Suite 300, Dallas, Texas 75247.

### III.

#### JURISDICTION AND VENUE

3.01    Pursuant to 28 U.S.C. §1331, jurisdiction lies in the United States District Court for the Northern District of Texas, as this action involves a question of the application of federal law, including the Family and Medical Leave Act of 1993 (the "FMLA").

3.02    Venue for Plaintiff's cause of action stated herein lies in the Northern District of Texas because the acts alleged in this Complaint took place, in whole or in part, within the boundaries of this District pursuant to 28 U.S.C. §1391.

### IV.

#### FACTUAL ALLEGATIONS

4.01    Plaintiff was hired on at ChildCareGroup August 6, 2018 as a Marketing and Events Specialist getting paid $55,000 annually. Plaintiff was a faithful and loyal employee at Defendant before being fired on October 23, 2019.

4.02    Plaintiff reported to Tori Mannes and John Owen.

4.03    On or about October 26, 2018, Plaintiff was diagnosed with breast cancer. Plaintiff told her employer right away.

4.04    On or about November 2018 Ms. Mannes called Plaintiff into her office and told Plaintiff she had been doing all of her duties incorrectly. Ms. Mannes claimed Plaintiff had been

struggling since Plaintiff's onboarding and had not been able to get on the right track. Plaintiff told Ms. Mannes that Plaintiff had asked Ms. Mannes several times for a one-on-one meeting to do a 90-day review to determine if Plaintiff was meeting Ms. Mannes expectations and to set goals for the year. Plaintiff had tried to get on Ms. Mannes calendar several times, but Ms. Mannes was never available to sit with Plaintiff.

   4.05   After the meeting, Plaintiff went to Theresa Irwin and told her Plaintiff was afraid to go out on leave to begin treatment for the cancer diagnoses because Plaintiff was afraid if she left for any amount of time Ms. Mannes would fire her.

   4.06   Ms. Irwin and Ms. Mannes that if Plaintiff went on leave right then, Plaintiff's job was not protected.

   4.07   During this period of time ChildCareGroup was getting ready for the Great Adventure Hunt, and Plaintiff was doing her best to process what was going on with Plaintiff's health and avail herself to Plaintiff's duties, especially those surrounding The Hunt.

   4.08   Ms. Mannes would make negative comments to Plaintiff about members of Plaintiff's team having to take pictures at events because Plaintiff was away at a health appointment.

   4.09   Also during this time, Ms. Mannes tried to force Plaintiff to tell Plaintiff's team about the cancer diagnosis. There were several closed-door meetings in which Ms. Mannes would tell Plaintiff "I do not know how much longer I can keep the diagnosis a secret" and would urge Plaintiff to tell the team.

   4.10   Ms. Mannes would walk over the Plaintiff's desk and speak loudly about Plaintiff's health and treatment plan. Finally, Plaintiff asked Ms. Mannes if she had questions about Plaintiff's health and treatment, they could go to Ms. Mannes office to discuss it. After that Ms.

Mannes had very few questions about Plaintiff's health and treatment.

4.11    Before the office went out on Christmas break, John Owen tried to force Plaintiff to tell the team about Plaintiff's diagnosis.  Mr. Owen told Plaintiff to go home during break and think about a way to tell the team went everyone got back from the break.  Mr. Owen told Plaintiff to be ready to tell the team when she returned.

4.12    After Plaintiff left Mr. Owen's office Plaintiff pulled Theresa Irwin into the boardroom to confirm that Plaintiff's health information is considered private and Plaintiff was under no obligation to make anyone aware of it.  Ms. Irwin said Plaintiff did not have to tell anyone about Plaintiff's health or treatment plan.

4.13    In December 2018, in effort for Plaintiff to get to know Plaintiff's team, Plaintiff began instituting brain breaks at 3 p.m.  Plaintiff and her teammates would stop work at 3:00 p.m. and do a brainteaser, play a game or just visit with each other.  Ms. Mannes immediately began complaining to Mr. Owens about the breaks and even said they were too loud and disturbing our other coworkers in an attempt to shut down the team bonding ritual.

4.14    In January 2019 Plaintiff's performance review was completed by Mr. Owen and Ms. Mannes.  Based on the results, Plaintiff met expectations on the majority of the metrics listed in the evaluation.  During the meeting to review the evaluation, the only suggestion for improvement Mr. Owen has was regarding the 2017 Annual report.  Plaintiff kept Mr. Owen looped into every aspect of the design and print process.  Mr. Owen saw all drafts, provided his feedback for edits and approved everything before Plaintiff sent it to the printer.  During the review, Mr. Owen informed Plaintiff that he had taken the report to a friend that is a printer and asked them to critique Plaintiff's work.  Mr. Owen then included the conversation he had with his printer friend in Plaintiff's 2018 performance review.  Feedback on Plaintiff's performance in 2018

was determined by someone that does not work for ChildCareGroup and is not familiar with Plaintiff's skillset and the person does graphic design and printing for a living.

4.15   Furthermore, any allegations that Plaintiff was not doing her job is because Mr. Owen and Ms. Mannes are no longer allowing Plaintiff to complete the duties assigned to Plaintiff in her role at the ChildCareGroup.  Mr. Owen and Ms. Mannes had kept Plaintiff siloed from Sparkfarm, Allan Moy and Brandera in an attempt to compartmentalize Plaintiff's position and gave Plaintiff's tasks to others to remove Plaintiff from her role.

4.16   In addition, instead of working with Plaintiff to create a shared vision when it comes to designing collateral, projects are taken away from Plaintiff and given to either an outside firm or Allan Moy or Plaintiff was given the tasks at the very last minute.

4.17   Plaintiff began working on a design for The Great Big Jam invitation in November 2018 and sent it to Mr. Owen and Ms. Mannes for their feedback.  During the team meeting in June 2019, Plaintiff was informed that the task had been handed off to a designer.

4.18   Also in January 2019, Ms. Mannes shared information regarding Plaintiff's diagnosis with Allan Moy during the Great Adventure Hunt.  This was a violation of Plaintiff's rights to medical and heath privacy.  Plaintiff spoke to Theresa Irwin to make her aware and asked for assistance keeping Plaintiff's information private.

4.19   On May 2, 2019, Mr. Owen and Plaintiff were attempting to pull up a United Way presentation on Melissa Miesse's laptop but were unable to because they could not connect to the agency's drive.  This is something Melissa Miesse would have to access to work from home.  Any claims of Ms. Miesse working from home prior to this date on tasks for the agency was never questioned.

4.20   On June 18, 2019, Plaintiff was pulled into a meeting with Mr. Owen, Ms. Mannes

and Kayla Odom. During this meeting, Plaintiff was informed that Plaintiff's absences was causing other people to be obligated to do Plaintiff's job. Plaintiff had left for a doctor's appointment the day before around 11:00 am. Plaintiff had arrived at work early that morning so there would not be a problem. While Plaintiff was at the doctor's office Ms. Mannes texted Plaintiff asking if Plaintiff was in the office and that Sytire Bates had informed Ms. Mannes that Plaintiff was at an appointment. Plaintiff confirmed she was at an appointment and would be back after lunch. Ms. Mannes told Plaintiff she wanted to meet with Melissa Miesse and Plaintiff regarding The Great Big Jam.

4.21    When Plaintiff returned from the doctor's appointment Plaintiff went to see Melissa Miesse to see if the meeting was still on. Melissa said no that Ms. Mannes had Allan Moy handled whatever Ms. Mannes had needed.

4.22    In May 2019, Melissa Miesse had a c-section to remove a cancerous tumor. Melissa returned to work on June 7, 2019. Ms. Miesse told Plaintiff she had worked out a part-time schedule and has FMLA. Ms. Miesse started work after Plaintiff so there is no way she could be eligible for FMLA. Ms. Miesse is a Caucasian woman. Ms. Miesse is allowed to work from home.

4.23    On July 10, 2019 John Owen asked Plaintiff to take pictures at an event happening that Saturday.

4.24    On July 17, 2019 Plaintiff was informed by Mr. Owen that Plaintiff was not allowed to work from home, although Plaintiff had been allowed to on the Fridays during all previous chemotherapy treatments. Mr. Owen's reason was that several priorities required Plaintiff to be in the office, where in fact, they did not.

4.25    Mr. Owen wanted Plaintiff to upload images into a Dropbox account. Locating and uploading can only be done on Plaintiff's work laptop. Mr. Owen left a markup of a design he

wanted for a flyer on Plaintiff's desk with notes.  Mr. Owen could have easily taken a picture of this and scanned it and had a phone call with Plaintiff to communicate what he needed – something that typically happens when projects are given to Allen Moy when Mr. Moy is working from home.  The flyer could only be created using Plaintiff's work laptop.  Mr. Owen sent Plaintiff an email to "make sure I was on top of things."  All tasks listed had been completed at least a month prior and Plaintiff emailed Mr. Owen letting him know the status and attached the "sent emails".  The only exception to the list was the Dropbox photo archives, as Plaintiff was pending information from Mr. Owen about an account upgrade, the No Small Matter Flyer – a task Mr. Owen had just given to Plaintiff that morning.

4.26   On July 18, 2019 Plaintiff requested a formal investigation into harassment claims to Kayla Odom.

4.27   Work accommodations had been made for Melissa Miesse that were not extended to Plaintiff.

4.28   Ms. Mannes and Mr. Owen did everything they could to make things difficult for Plaintiff while Plaintiff was managing her health problems and working full time.

4.29   On June 19, 2019, Plaintiff, Ms. Mannes, Mr. Owen and Kayla Odom had a meeting.  Plaintiff was told she needed to put appointments on her Outlook calendar so everyone could know where Plaintiff was during the day.  Plaintiff agreed.  Plaintiff had always let Mr. Owen know when she was leaving for Plaintiff's doctor appointments.  Mr. Owen agreed that Plaintiff had notified each time she had an appointment and told him when she was leaving.  Plaintiff agreed to put all of the appointments on the calendar.

4.30   On Friday, July 19, 2019, Plaintiff was asked to send the final invitation in a Constant Contact email.  The design looked incredibly similar to the one Plaintiff had begun

working on the year before.

4.31  In the Spring of 2019 ChildCareGroup hired Sparkfarm as a PR firm.

4.32  Plaintiff sent an email to Ms. Mannes and Mr. Owen making them aware of Sparkfarm's lackluster following on their social media pages.

4.33  Mr. Owen and Ms. Mannes then began separating Plaintiff from marketing tasks given to Sparkfarm and would not include Plaintiff in conversations with Sparkfarm regarding projects that include aspects of Plaintiff's duties.  Repeated requests to be included in conversations with Sparkfarm went unanswered.

4.34  Plaintiff asked Mr. Owen if she could begin leaving at 4 p.m. in the afternoon because Plaintiff was always the first one at work between 7:30 and 7:50 a.m. and Plaintiff doesn't leave until 5:00.  Mr. Owen denied Plaintiff's request because Ms. Mannes would not allow Plaintiff to leave work at 4:00.  Melissa Miesse, a Caucasian, got to work between 9:00 and 10:00 and would leave early every day.

4.35  In June 2019, Plaintiff was not invited to a meeting with Recycle 2 Support although they would have to work with Plaintiff for collateral.  The entire team – including the intern, was invited.  Plaintiff went to the meeting and when she arrived, she was told my Melissa Miesse that she did not know why she was there, as it was not her meeting.  Melissa Miesse was invited for her ideas.

4.36  On June 21, 2019, Plaintiff provided a note to Kayla Odom from Plaintiff's AP advising Plaintiff to work from home during chemo and radiation treatment.  Plaintiff's AP also recommended that Plaintiff not lift more than 10 pounds while the medi-port was in place.  As the photographer, during events Plaintiff would take pictures for the agency.  The camera strap would constantly tug on the medi-port in Plaintiff's chest and irritate her skin.  Plaintiff would continue

to perform these tasks as she was afraid of retaliation from Ms. Mannes and Mr. Owen.

4.37    On or about August 6, 2019, Plaintiff went out on FMLA for the Breast Cancer. ChildCareGroup uses Cigna to administer their FMLA claims.

4.38    On October 29, 2019 Plaintiff was to return to work from her approved FMLA leave.

4.39    On October 23, 2019 Plaintiff was fired and told her position had been eliminated.

## V.

### FIRST COUNT

#### FAMILY AND MEDICAL LEAVE ACT (FMLA) DISCRIMINATION, INTERFERENCE AND RETALIATION

5.01    The foregoing paragraphs in this Complaint are incorporated in this count by reference as fully as if set forth at length herein.

5.02    Plaintiff was an eligible employee under the FMLA. Plaintiff had worked for Defendant for at least twelve (12) months and had worked at least 1,250 hours during the twelve (12) months prior to taking the leave.

5.03    Defendant was subject to the provisions of the FMLA. Defendant employed at least fifty (50) employees within a seventy-five (75) mile radius of Plaintiff's work site for twenty (20) or more work weeks in the prior or current calendar year.

5.04    At the time of the discharge, Plaintiff had suffered from one or more "serious health conditions" as defined by the FMLA. 29 U.S.C. 2611 (11). In particular, Plaintiff was suffering with chronic migraines, insomnia and she had battled breast cancer.

5.05    Defendant interfered with Plaintiff in the exercise of her FMLA rights by terminating her employment prior to her return from FMLA leave. Plaintiff made good faith

efforts to submit all respective medical certifications for her FMLA leave.

5.06    The FMLA's interference provision makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise," any substantive FMLA right. 29 U.S.C. § 2615(a)(1); *see also Haley v. Alliance Compressor LLC*, 391 F.3d 644, 649 (5th Cir. 2004); *Kauffman v. Fed. Express Corp.*, 426 F.3d 880, 884 (7th Cir. 2005). Notably, a claim that an employee was terminated for taking FMLA leave is cognizable under *both* an interference or prescriptive claim under 29 U.S.C. §2615(a)(1), or under a retaliation or proscriptive claim under §2615(2). *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 447 n.2 (6th Cir. Ohio 2007).

5.07    As a result of her wrongful termination, Plaintiff has suffered damages in the form of lost wages and benefits. Plaintiff is entitled to back pay, plus interest on that amount, to compensate her for that loss. 29 U.S.C § 2617(a)(1)(A)(i)-(ii).

5.08    The aforementioned acts were and are a willful violation of the FMLA, and entitle Plaintiff to recover damages as provided by 29 U.S.C. 2617, including liquidated damages. Plaintiff further seeks reinstatement to her position or a comparable position with reinstatement of benefits and seniority time.

5.09    As a result of Defendant's actions, Plaintiff has found it necessary to hire the services of the undersigned attorneys, for which Plaintiff seeks further relief. 29 U.S.C § 2617(a)(3).

## VI.

### 42 U.S.C. § 1981 – RACIAL DISCRIMINATION IN VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT

6.01.   The foregoing paragraphs of this Complaint are incorporated in this count by reference as fully as if set forth at length herein.

6.02.   42 U.S.C. §1981 provides that:

"**§ 1981.  EQUAL RIGHTS UNDER THE LAW**

(a)  Statement of equal rights. – All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b)  'Make and enforce contracts' defined. – For purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c)  Protection against impairment. – The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State Law."

6.03   Defendant has deprived Plaintiff of his right to make and enforce contracts and to "the full and equal benefit of all laws and proceedings" as is enjoyed by white citizens, in violation of 42 U.S.C. § 1981.

6.04   Defendant has engaged in a single, continuous course of conduct of discrimination against Plaintiff because of his race, in order to destroy Plaintiff, his career, and his professional life.

6.05   Such discrimination by Defendant against Plaintiff was intentional and was a but for factor in Defendant's conduct toward Plaintiff.  Accordingly, Plaintiff is entitled to recover damages from Defendant for back pay, front pay, overtime pay, past and future pecuniary losses, emotional pain and suffering, inconvenience, loss of enjoyment of life and other nonpecuniary losses.  Further, this discrimination was done by Defendant with malice or with reckless indifference to Plaintiff's federally protected rights.  Plaintiff is therefore also entitled to recover punitive damages in a sum which is in excess of the minimum jurisdictional limit of this Court.

Plaintiff also seeks to recover all costs of Court, attorney's fees, and expert fees.

## VII.

## JURY TRIAL DEMANDED

7.01   PLAINTIFF DEMANDS A TRIAL BY JURY.

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendant be cited to appear and answer herein, and that on final trial, Plaintiff have and recover the following relief against Defendant:

1) Judgment against Defendant for actual damages, including lost wages and benefits (both back pay and front pay), and damage to earnings capacity, the sum to be determined at time of trial;

2) Additional damages as allowed by law;

3) Reinstatement;

4) The costs and expenses incurred by Plaintiff in seeking new employment;

5) An order that Defendant take such other and further actions as may be necessary to redress Defendant's violation of the FMLA;

6) Prejudgment and postjudgment interest at the maximum legal rate;

7) Attorneys' fees;

8) Experts' fees;

9) All costs of court; including attorney's fees; and

10) Such other and further relief to which Plaintiff may be justly entitled.

Dated:  February 8, 2021

Respectfully submitted,

**KILGORE & KILGORE, PLLC**

By: *W. D. Masterson*
W.D. Masterson

\#

        State Bar No. 13184000
        wdm@kilgorelaw.com
        3109 Carlisle Street
        Dallas, Texas 75204
        Telephone:  214/969-9099
        Telecopier: 214/953-0133

**ATTORNEYS FOR THE PLAINTIFF
BRITTNEY JOHNSON**